[No. S099557. Aug. 4, 2003.]

In re ZETH S., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
STACY S., Defendant and Appellant.

## COUNSEL

Rich Pfeiffer and Jennifer Mack, under appointments by the Supreme Court, for Defendant and Appellant.

Laurence M. Watson and Benjamin P. deMayo, County Counsel, Robert G. Overby, Julie J. Agin, Deborah M. Gmeiner and Rachel M. Bavis, Deputy County Counsel, for Plaintiff and Respondent.

Law Office of Harold LaFlamme, Craig E. Arthur and Karen Cianfrani for Dependency Children in the County of Orange and Trial Attorneys for Zeth S. as Amici Curiae on behalf of Plaintiff and Respondent.

John J. Sansone, County Counsel (San Diego), Susan Strom, Chief Deputy County Counsel, Gary C. Seiser, Deputy County Counsel; and Ruth Sorensen for California State Association of Counties and County of San Diego as Amici Curiae on behalf of Plaintiff and Respondent.

Melissa A. Chaitin, under appointment by the Supreme Court, for Minor.

William Wesley Patton for Whittier Law School Legal Policy Clinic as Amicus Curiae.

Robert C. Fellmeth; Shannan Wilber; Janet G. Sherwood and Donna Furth for Children's Advocacy Institute of the University of San Diego School of Law, Legal Services for Children and the Northern California Association of Counsel for Children as Amici Curiae.

Kenneth P. Sherman, Lisa E. Mandel and Anne E. Fraggasso for Dependency Court Legal Services, Inc., as Amicus Curiae.

## OPINION

**BAXTER, J.—** ▇ In a juvenile dependency appeal from an order terminating parental rights, may the Court of Appeal receive and consider post-judgment evidence that was never before the juvenile court, and rely on such evidence outside the record on appeal to reverse the judgment? The general answer is no, although in the rare and compelling case an exception may be

warranted. In this case the Court of Appeal erred in receiving and considering such postjudgment evidence, presented for the first time through the unsworn statements of the minor's appointed appellate counsel in a letter brief, and in further relying on that evidence to reverse the juvenile court's order and judgment terminating parental rights. Accordingly, the judgment of the Court of Appeal must be reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

Stacy S. (mother) appealed from an order and judgment of the Orange County Juvenile Court terminating her parental rights pursuant to Welfare and Institutions Code section 366.26.[1] The minor, Zeth S., was born in February 1997, and was first taken into protective custody by the Orange County Social Services Agency (agency) on July 2, 1998, at age 17 months. A juvenile dependency petition was thereafter filed by the agency, alleging that the minor's parents had failed to protect and provide support for the minor. (§ 300, subds. (b) and (g).) The grounds alleged in support of the petition included mother's and father's history of alcohol and drug abuse and related incarcerations, the unsanitary conditions of the paternal grandparents' home in which the minor had been left, and the likelihood that father was in violation of his parole. During the incident that culminated in the taking of the child into protective custody, both mother and father were arrested for delaying/obstructing a peace officer in the performance of his duty, with mother additionally charged with assault and battery on a peace officer. After a detention hearing the minor was released to the home and care of his maternal grandfather, Gregory S., pending adjudication and dispositional hearings. Maternal grandfather confirmed that minor's parents were using drugs and would not be permitted to reside in his home.

At the jurisdictional hearing held August 4, 1998, the allegations of the petition were found true and the minor was declared a dependent child of the Orange County Juvenile Court. The minor was ordered to remain in the custody of the maternal grandfather pending a six-month review hearing. (§ 366.21, subd. (e).) At that hearing it was ordered that the minor be continued as a dependent child of the court, that custody of the minor remain with the maternal grandfather, and that previously ordered reunification

---

[1] All further statutory references are to this code unless otherwise indicated.

services continue to be offered to mother and father pending a 12-month review hearing. (§ 366.21, subd. (f).)

In March 1999, pursuant to a stipulation by the parties, the minor was released to mother's custody for a 60-day trial visit. The results were favorable, mother having obtained temporary employment and a subsidized apartment with the agency's assistance. In May 1999, the minor was returned to mother under a court-ordered plan of family maintenance.

In October 1999, however, the agency filed a section 387 supplemental petition for more restrictive placement, alleging that mother had left the minor in the paternal grandparents' unsanitary home for unmonitored visits, without mother present, and on at least one occasion without adequate provisions for the child's care, all in violation of the agency's directives. Supporting statements reflected that mother had entrusted the minor's care to other unauthorized persons at various times and was hosting drunken parties at her apartment. During one such party a guest had passed out, leading to police intervention and mother's ultimate eviction from the apartment.

In a first amended supplemental petition it was further alleged that father, who had been released from prison, was living in the paternal grandparents' residence, had not completed his court-ordered case plan, and was being permitted unauthorized contacts with the minor by mother. Statements by the maternal grandfather in support of the supplemental petition reflected his belief that at times the minor was "terrified" to be with his mother, that the minor was experiencing a lot of stress, and that his mother was neglecting him.

At the conclusion of the detention hearing on the amended supplemental petition, the minor's out-of-home placement with maternal grandfather was continued, and he again confirmed that mother would not be living in his home while he cared for the minor. In early December 1999, mother moved into a sober living home; within one week she was discharged for infractions of the rules. On December 13, 1999, the allegations of the supplemental petition were found true and the minor continued as a dependent child of the court.

A dispositional hearing was held January 13, 2000. The trial court denied further reunification services, found by clear and convincing evidence that return of custody of the minor to mother or father would be detrimental to the minor, and set the matter for a section 366.26 selection and implementation hearing, also sometimes referred to as a termination or permanency hearing (366.26 hearing). The agency report prepared for the 366.26 hearing reflects that from October 25, 1999, until February 28, 2000, mother visited the minor

(in maternal grandfather's home) no more than once per week. During the period from February 28 through April 19, 2000, mother did not visit the minor at all. During those periods, mother also refused agency-provided counseling and refused to comply with biweekly drug testing per the court's order. Father remained incarcerated from August 1999 through February 13, 2000. On March 18, 2000, mother and father were arrested for possession of stolen property and illegal drugs. Father's parole agent observed "track marks" on both mother's and father's arms at the time of their arrest, and each admitted to recent heroin use. During those same periods, maternal grandfather reported that the minor was "flourishing" in his care; minor was receiving regular medical attention and had been successfully enrolled in preschool.

The agency's report recommended termination of parental rights and adoption as the permanency plan, indicating it was "very likely that the child will be adopted by his current caretaker Greg [S.]." Mr. S. was divorced from maternal grandmother, Janet F., herself a recovering alcoholic. He was in good health, had no criminal record, was stably employed, and resided with the minor in his two-bedroom apartment. He stated he loved his grandson very much, believed it important for him to adopt the child in order to ensure the child's safety and well-being, and did not believe this could be achieved with either parent, as there was no prospect that either mother or father would be able to care for the minor in the near future. The report further indicated, "[Gregory S.] has stated that he understands that by adopting the child he will be responsible for the child just as if the child was his biological child. The Homestudy worker on this case reports that the caretaker presents [himself] as a mature and responsible individual who clearly understands the responsibilities of adoption."

The agency's report was admitted into evidence without objection at the selection and implementation hearing held May 9, 2000. Father waived his right to be present at the hearing. Mother contested the agency's recommendation that her parental rights be terminated. She admitted her recent heroin use but testified she had a close bond with the minor and claimed she was his primary caretaker during weekend visits at the maternal grandfather's home. Mother testified that during those weekend visits she made lunches for the minor, bathed him, and played with him. Mother acknowledged that she had not visited the minor for significant portions of the preceding months. She further acknowledged that her father never refused to let her see the minor as long as she was sober, but did not permit her to be with the minor when she was under the influence. Mother herself agreed that she did not want to be in the minor's presence when she was under the influence. She testified, "I love my son very much. I feel that I do have personal issues and problems that can be corrected, perhaps, by counseling or therapy. However, I don't think that interferes with the way that I can parent my child. And I believe that it's

more important for my son and I to be together than anything else at this point." Maternal grandmother, who confirmed she was divorced from maternal grandfather and was herself a recovering alcoholic, testified she had observed a positive bond between mother and the minor. She conceded, however, that at the time of the hearing mother was not in a position to take responsibility for care of the minor.

Minor's appointed trial counsel joined with the agency in arguing for termination of mother's parental rights and adoption as the permanent plan for the minor. She urged that consistent visitation by mother had not been shown, and that mother and maternal grandmother were minimizing the extent of mother's personal problems while exaggerating the positive nature of the relationship between mother and the minor. Arguing that the minor "has been on a rollercoaster long enough" and deserves permanency, counsel for the minor stated: "His [maternal] grandfather is ready, willing and able to adopt. He [the minor] is adoptable, even if the grandfather didn't. It's time for [the minor] to get that permanency that he deserves."

At the conclusion of the 366.26 hearing, the trial court indicated it was discounting much of mother's testimony, noting she had for the most part merely responded to leading questions posed by her counsel. The court also found maternal grandmother's testimony in favor of mother biased and unconvincing. The court found the minor adoptable, and further concluded mother failed to meet her burden of establishing the sole possibly applicable statutory exception to termination of her parental rights under the circumstances—the so-called benefit exception—because she had failed to establish the threshold requirement of "regular visitation and contact with the child," and even had she done so, she could not have further established that "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(A).) The court found that termination of parental rights would not be detrimental to the minor and would in fact be in the minor's best interests, and entered an order terminating mother's and father's parental rights and freeing the child for adoption.

Mother alone appealed from the judgment, on the sole ground that the trial court erred in refusing to apply the benefit exception to this case. The Court of Appeal appointed counsel for the minor in mother's appeal. Minor's appellate counsel filed a two-page letter brief in which she indicated she had investigated the minor's current circumstances and learned that the minor was doing well in the home of the maternal grandfather, that mother visited regularly and often spent the night, that during her visits mother assumed primary parental responsibility for the minor, and that "[a]ccording to the grandfather, he felt pressure to adopt [the minor] and preferred to become [the minor's] legal guardian." Minor's appellate counsel concurred with

mother that parental rights should not have been terminated because the order terminating parental rights was not in the minor's best interests.[2]

Noting that minor's appellate counsel was taking a different position than minor's trial counsel, the Court of Appeal invited supplemental briefing from the parties on the following question: "In a case where a minor's trial counsel unequivocally assured the trial judge at the [366].26 hearing that the minor's current caretaker is 'ready, willing and able to adopt,' yet the minor's appellate counsel tells the appellate court in her brief on appeal that the minor's current caretaker was pressured into saying he wanted to adopt the child, and would prefer to be the child's legal guardian, and further assuming, for the sake of argument, that the trial court did not err in not applying the [section 366.26, subdivision] (c)(1)(A) 'benefit exception' at the [366].26 hearing, what is the proper disposition of the case on appeal?" Following supplemental briefing, the Court of Appeal in a published opinion reversed the order terminating parental rights and remanded the matter to the trial court for an "updated review hearing in the form of a retrial of the [366].26 hearing."

Agency petitioned for rehearing. Appended to the petition was a supporting sworn declaration by minor's maternal grandfather. With regard to minor's appellate counsel's representation to the court that he preferred guardianship over adoption, Mr. S. explained that he had learned from the social services agency, as well as from a class which he attended, that under the juvenile dependency law, adoption is the preferred permanent plan over legal guardianship, and that if he sought legal guardianship rather than adoption of his grandson, the court could place his grandson for adoption with an "outside family" in furtherance of the law's preference for adoption. With regard to counsel's further suggestion to the court that mother was now caring for the minor at maternal grandfather's home, Mr. S. responded in the declaration, "I understand that it has been reported that Zeth's mother is regularly his primary caretaker. That of course is not so. She is caretaker when she visits, under my supervision. Her visits are not regular, and usually on the weekends only." Rehearing was denied.

---

[2] At oral argument before this court, minor's appellate counsel confirmed that in the course of this appeal she neither contested nor intended to contest the juvenile court's finding that the minor was adoptable, and never raised nor intended to raise a claim on habeas corpus that minor's appointed trial counsel rendered ineffective assistance of counsel to the minor in the juvenile court proceedings below. Minor's appellate counsel further agreed that it appears the Court of Appeal utilized the postjudgment evidence issue as a means of reexamining the mother-child relationship in this case.

We granted the agency's petition for review.[3]

## DISCUSSION

It has long been the general rule and understanding that "an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration." (*In re James V.* (1979) 90 Cal.App.3d 300, 304 [153 Cal.Rptr. 334].) This rule reflects an "essential distinction between the trial and the appellate court . . . that it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law . . . ." (*Tupman v. Haberkern* (1929) 208 Cal. 256, 262–263 [280 P. 970].) The rule promotes the orderly settling of factual questions and disputes in the trial court, provides a meaningful record for review, and serves to avoid prolonged delays on appeal. "Although appellate courts are authorized to make findings of fact on appeal by Code of Civil Procedure section 909 and rule 23 of the California Rules of Court, the authority should be exercised sparingly. (*De Angeles v. Roos Bros., Inc.* [(1966)] 244 Cal.App.2d 434, 443 [52 Cal.Rptr. 783].) Absent exceptional circumstances, no such findings should be made. (Green v. American Cas. Co. (1971) 17 Cal.App.3d 270, 273 [94 Cal.Rptr. 528].)" (*Tyrone v. Kelley* (1973) 9 Cal.3d 1, 13 [106 Cal.Rptr. 761, 507 P.2d 65]; see also In re Brittany H. (1988) 198 Cal.App.3d 533, 554 [243 Cal.Rptr. 763].)

There is no blanket exception to the general rule for juvenile dependency appeals. Review of such appeals is governed by generally applicable rules of appellate procedure, with proper deference to be paid to the factual findings and uncontested rulings of the juvenile court, and all appropriate inferences to be drawn in favor of the judgment below. In furtherance of the state's strong interest in preserving and promoting the welfare of dependent children of the court, and the fundamental right of such children to a stable parent-child relationship and a permanent home, the Legislature has enacted a comprehensive juvenile dependency scheme that can lead to orders removing a child from the parents' home, declaring the child a dependent child of the court, and ultimately terminating parental rights and freeing the child for adoption, as occurred in this case. Various provisions of the statutory scheme strictly control the timing and manner of appeal or writ review of the critical findings

---

[3] We have received amicus curiae briefs from the County of San Diego, joined in by the California State Association of Counties, and the Law Office of Harold LaFlamme, both in support of petitioner agency. We have also received amicus curiae briefs from the Northern California Association of Counsel for Children, joined in by the Children's Advocacy Institute of the University of San Diego School of Law and Legal Services for Children, and Dependency Court Legal Services, Inc. Both of these briefs indicate they are not intended to be in sole support of any one party in this case.

and orders that can culminate in an order terminating parental rights, their primary goal being to expedite finality and thereby achieve permanency for the child.

The facts of this case are tragic but unexceptional; they afforded no basis for the Court of Appeal to deviate from the settled rules on appeal in the manner in which it did when entertaining mother's appeal from the order terminating her parental rights. At the time the minor Zeth was taken into protective custody, he was a healthy 17-month-old baby boy. As far as the record reflects, he thrived in the out-of-home care and custody of his maternal grandfather, and was successfully admitted into preschool while under his grandfather's care. While in the former care and custody of his mother, however, the picture was not as bright. Mother's alcohol and drug abuse, and her related arrest and incarceration, prevented her from fulfilling her parental obligations to protect and provide support for her minor child. (§ 300, subds. (b) and (g).) She repeatedly left the child in the care of his paternal grandparents, in an unsanitary home, and on at least one occasion without basic provisions for his care. Father, who, like mother, suffered from a history of alcohol and substance abuse, was a parolee who was permitted unsupervised and unauthorized contacts with the minor by mother, even after the child was taken into protective custody and then released back to mother for a trial visit. Maternal grandfather furnished sworn statements relating his belief that at times the minor was "terrified" to be with his mother, that he was experiencing a lot of stress, and that his mother was neglecting him. His sworn statements further reflect that it was clear to him, from the time his grandson was taken into protective custody through the pendency of mother's appeal, that his daughter was incapable of providing a permanent home or consistent care and support for her minor son. The record is replete with evidence of mother's alcohol and drug (heroin) abuse, including drunken parties leading to her eviction from her subsidized apartment, and the incident that led to her arrest for assault and battery on a peace officer and the necessity of taking the child into protective custody.

It is particularly noteworthy that no party to this appeal has ever questioned or challenged the trial court's critical finding, made at the termination hearing below, that the minor Zeth was adoptable within the meaning of section 366.26, subdivision (c)(1). "The issue of adoptability . . . focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.]" (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 [28 Cal.Rptr.2d 82].) All that is required is clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time. (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223 [4 Cal.Rptr.2d 101].) As noted, minor's appointed appellate counsel confirmed at oral argument before this court that in the

course of this appeal she never contested the finding of the juvenile court that the minor was indeed adoptable within the meaning of the statute.

In light of the factual record before us, and the rationale invoked by the Court of Appeal to reverse the juvenile court's judgment, the central issue on review is this: May a reviewing court look to postjudgment evidence that is outside the record on appeal and was never considered by the trial court—here, an unsworn statement by minor's appellate counsel that maternal grandfather may have felt pressured into choosing adoption of his grandson over legal guardianship—to reverse the trial court's judgment terminating parental rights?[4]

This is not the first time Division Three of the Fourth District Court of Appeal has confronted the matter of the relevance and admissibility of postjudgment evidence in a juvenile dependency appeal. The agency and its amici curiae have pointed to four other published decisions authored by the court, each seemingly intended to further advance the court's belief that postjudgment evidence will often be relevant in an appeal of an order terminating parental rights and freeing a dependent child for adoption, that counsel appointed for the minor on appeal is obligated by statute to independently investigate the child's current out-of-home placement and bring any evidence of changed circumstances to the attention of the reviewing court, and that such evidence should be liberally received and considered by the reviewing court for its potential impact on the appeal from the juvenile court's termination order entered at the 366.26 hearing. Although we have no

_____

[4] A separate issue raised in the agency's petition also falls within our grant of review: May a section 388 petition for modification be brought in the trial court while an appeal from an order terminating parental rights is pending? The issue arose when the Court of Appeal, in hypothetically describing the procedure whereby an appellate court would reverse a judgment terminating parental rights based on postjudgment evidence of changed circumstances and remand the matter for a new 366.26 hearing, at one point suggested that "Additionally, the pendency of the appeal would allow the parent to bring a section 388 motion [for modification] if appropriate."

The Court of Appeal's dicta notwithstanding, it is settled that subdivision (i) of section 366.26 unequivocally precludes the juvenile court from modifying an order terminating parental rights entered pursuant to section 366.26: "Any order of the court permanently terminating parental rights under this section shall be conclusive and binding upon the child, upon the parent or parents and upon all other persons who have been served with citation by publication or otherwise as provided in this chapter. *After making the order, the court shall have no power to set aside, change, or modify it,* but nothing in this section shall be construed to limit the right to appeal the order." (§ 366.26, subd. (i), italics added.) Past decisions have recognized that "[t]his statute forbids alteration or revocation of an order terminating parental rights except by means of a direct appeal from the order." (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1161 [65 Cal.Rptr.2d 913] (*Meranda P.*); see *In re Ronald V.* (1993) 13 Cal.App.4th 1803, 1806 [17 Cal.Rptr.2d 334] [section 366.26, subdivision (i) precludes section 388 petition to modify order terminating parental rights on grounds of changed circumstances].) Accordingly, no further discussion of the point is required here.

doubt the Court of Appeal had the best interests of the minors in mind when it decided this and the related cases, the court's rationale and holdings are nonetheless well outside the legal mainstream, and cannot be squared with the general rules on appeal and specific statutory provisions that govern juvenile dependency appeals.

The Court of Appeal's four related decisions can briefly be summarized as follows. In *In re Jonathan M.* (1997) 53 Cal.App.4th 1234 [62 Cal.Rptr.2d 208], the court stated, "This court *routinely* accepts evidence per Code of Civil Procedure section 909 in juvenile dependency cases to expedite just and final resolution for the benefit of the children involved. [Citations.]" (*Id.* at p. 1236, fn. 2, italics added.)[5]

The court next decided *In re Eileen A.* (2000) 84 Cal.App.4th 1248 [101 Cal.Rptr.2d 548] (*Eileen A.*), which held that a dependent child's appointed appellate counsel, like the child's trial counsel in the juvenile court, has a "duty to make an independent evaluation based on the circumstances in each case," that "evidence as to how well the child is doing in a placement during the pendency of the appeal may be taken into account by the appellate court," and that "it is especially important that independent minor's appellate counsel evaluate what is in the best interests of their clients without any presumptions." (*Id.* at p. 1262, fn. 13.)

*In re Jeremy S.* (2001) 89 Cal.App.4th 514 [107 Cal.Rptr.2d 280] was decided next. That decision also stands for the proposition that in a parent's appeal from an order terminating parental rights, appointed appellate counsel for the minor can side with the parent and challenge the trial court's order by raising new matters arising from a change in the status or current circumstances of the child's preadoptive out-of-home placement, and that the normal requirements on appeal— that issues on appeal must first be raised in the trial court, and must be preserved through a timely notice of appeal—should routinely be dispensed with "[b]ecause the paramount concern of the appellate court in all dependency proceedings is for the protection and welfare of the child, [and] it would be inappropriate to simply ignore the issue raised by [the minor] as waived based on procedural technicalities." (*Id.* at p. 527.)

Finally, the Court of Appeal's decision in *In re Jayson T.* (2002) 97 Cal.App.4th 75 [118 Cal.Rptr.2d 228] (*Jayson T.*), rendered after its decision in the instant case, echoed its holding in *Eileen A.*—that orders terminating

---

[5] As we have noted, long-standing case law construing Code of Civil Procedure section 909 reaches just the opposite conclusion. "Absent exceptional circumstances, no such findings [based on the receipt of evidence outside the record on appeal pursuant to section 909] should be made. [Citation.]" (*Tyrone v. Kelley, supra,* 9 Cal.3d at p. 13; see also *In re Brittany H., supra,* 198 Cal.App.3d at p. 554.)

parental rights under section 366.26 must be reviewed under a standard that "look[s] for the child's best interests," rather than the traditionally applied deferential standard of review. (*Jayson T., supra,* 97 Cal.App.4th at p. 84, capitalization and italics omitted.) *Jayson T.* further holds that postjudgment evidence uncovered during the pendency of an appeal should routinely be received and considered, and can lead to reversal and the need for an "updated review hearing," even where the juvenile court itself has committed no legal error in terminating parental rights or selecting adoption as the permanent plan on the evidence before it at the termination hearing. (*Id.* at pp. 86, 91.)

The Court of Appeal in this case further expanded upon its view of the role of counsel appointed to represent minors on appeal first espoused in *Eileen A.* Here the court held that section 317, a provision which, by its express terms, is addressed to the duties and obligations of minors' *trial counsel* in dependency proceedings before the *trial court,* also applies by implication to minors' appointed appellate counsel, obligating counsel to serve the reviewing court as a " 'neutral' litigant" in a "quasi-judicial capacity" by independently investigating the current circumstances of the child's preadoptive placement, and by reporting any changes to the reviewing court so that the court can determine anew whether the lower court's judgment should be reversed and the matter remanded for a new 366.26 hearing.[6]

The chief problem with the Court of Appeal's approach, however well intentioned it was, is that it effectively substitutes the reviewing court's own post hoc determination of whether termination of parental rights remains in the minor's best interests[7] for the legislatively mandated determination that follows when the comprehensive juvenile dependency statutory scheme is

---

[6] There is no uniform statewide requirement or practice that separate counsel be appointed for the minor in an appeal by a parent from an order terminating parental rights pursuant to section 366.26. The parties have not asked us to address that circumstance, nor do the facts of this case present us with an occasion to consider it. It is noteworthy that the Fourth District Court of Appeal is the only Court of Appeal statewide to presently require appointment of counsel for the minor in all dependency appeals coming before that court. Thus, although the court in this case construed section 317 as obligating appointed counsel for the minor in every such appeal to investigate the status and circumstances surrounding the minor's current preadoptive placement and, if necessary, to report any changed circumstances to the reviewing court for consideration of their potential impact on the pending appeal of the termination order, as a practical matter, the effect of that holding would be limited to juvenile dependency appeals in which appellate counsel is appointed for the minor, a requirement that presently is only mandated in the Fourth Appellate District.

[7] As the Court of Appeal suggested, "[T]here can be no doubt about the *need* to take into account postjudgment developments in juvenile dependency cases." (Italics in original.) The court further opined that the postjudgment evidence in this case "is clearly relevant to a change of circumstances warranting a change in a prior [section 366.26] order *because the best interests of the child demand it.*" (Italics added.)

dutifully adhered to in the trial court. The Legislature, however, has determined that what is in the child's best interests is best realized through implementation of the procedures, presumptions, and timelines written into the dependency statutes. The statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions. This is particularly true where the reviewing court reaches a contrary determination on the basis of postjudgment evidence outside the record on appeal, which evidence, in likelihood, would have been irrelevant and excludable had it been known and presented to the trial court in the first instance.

The court in *Meranda P., supra,* 56 Cal.App.4th 1143, explained the nature of the statutory scheme from the parent's unique perspective in this way: "The dependency scheme is a 'remarkable system of checks and balances' (*In re Andrew B.* (1995) 40 Cal.App.4th 825, 865 [47 Cal.Rptr.2d 604]) designed to 'preserve the parent-child relationship and to reduce the risk of erroneous fact-finding in . . . many different ways . . .' (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 255 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) Until permanency planning, the parent's interest in having a child returned to the parent is the paramount concern of the law. (*Id.* at pp. 255–256; §§ 366.21, subds. (e) & (f), 366.22, subd. (a).) The parent is thus entitled to 12 months, and possibly 6 more months, of reunification services aimed at assisting the parent in overcoming the problems that led to the child's removal. (§§ 361.5, subd. (a), 366.21, subds. (e) & (f).) There is also in force at the dispositional hearing and at all subsequent prepermanency planning hearings a statutory presumption that the child will be returned to parental custody. (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).) [¶] In addition, there are 'precise and demanding substantive and procedural requirements' which the petitioning agency must fulfill before it can propose termination. At the dispositional hearing, the agency must show by the enhanced standard of clear and convincing evidence that removal of the child is necessary. (§ 361, subd. (b).) At the interim review hearings, the agency has the burden of showing by a preponderance of evidence that the return of the child to the parent would be detrimental to the child and that reasonable reunification services have been provided. (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).) Before reunification can be terminated, the agency must establish by a preponderance of evidence that it would be detrimental to return the child to the parent. (§§366.21, subd. (f), 366.22, subd. (a).) [¶] Also, independent judicial review of the case is mandated at least every six months during the reunification period and a myriad of positive findings are required with respect to every critical pre-permanency planning decision. (§§366.21, 366.22.) . . . [¶] Last, the relevant statutes provide for early and complete notification to the parent of

every stage of the proceedings during the entire course of the dependency." (*Meranda P., supra,* 56 Cal.App.4th at pp. 1154–1155.)

By the time the proceedings reach the stage of a 366.26 hearing, "[t]he number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child." (*Cynthia D. v. Superior Court, supra,* 5 Cal.4th at pp. 255–256 (*Cynthia D.*).) " '[T]he decisions made at the review hearing regarding reunification are not subject to relitigation at the termination hearing. This hearing determines only the type of permanent home.' " (*Id.* at p. 250, fns. omitted.)

█ Although the settled case law thus holds that the critical findings of parental unfitness, detriment, and the failure of attempts at reunification may not be reopened or reconsidered at the termination hearing, the Court of Appeal's approach in this and its related decisions, once again, is precisely to the contrary.

The Court of Appeal is of the view that to reverse and remand for an " 'updated review hearing' " (see *Jayson T., supra,* 97 Cal.App.4th at p. 91; see also *Eileen A., supra,* 84 Cal.App.4th at p. 1259), based on the receipt of postjudgment evidence during the pendency of a section 366.26 appeal, is somehow of less impact than would be an outright reversal of the judgment based on the new evidence. The court in *Jayson T.* suggested that "[i]f postjudgment developments cast doubt where the law requires certainty, there is no harm in allowing the trial court to take a second look at a child's adoptability." (*Jayson T., supra,* 97 Cal.App.4th at p. 78.) We fail to see any meaningful distinction between "tak[ing] a second look" at the child's adoptability, and outright reversal of the judgment.[8] No matter how the remedy is labeled, the result is the same; the trial court's judgment is reversed. In this case, the court once again reversed the juvenile court's judgment *"even though there was, strictly speaking, no 'error' by the juvenile court."* (*Jayson T., supra,* 97 Cal.App.4th at p. 84, italics added [describing the nature of our grant of review in this case].) Moreover, as already noted, in this case minor's appointed appellate counsel has herself conceded, at oral argument before this court, that by all appearances the Court of Appeal below had utilized the postjudgment evidence issue as a means of reexamining the mother-child relationship. Yet that was a settled matter which, by statutory

---

[8] In its decision in *Jayson T.,* even the Court of Appeal acknowledged that "[o]rdinarily, this appeal would result in an affirmance because of a deferential standard of review." (*Jayson T., supra,* 97 Cal.App.4th at p. 79.) The court further acknowledged that minor's appointed trial counsel had filed no appeal on behalf of the minor, and that "nothing as yet regarding actual unadoptability has been found, as a matter of fact, by a trial court." (*Id.* at p. 83.)

directive, could not be reopened for reconsideration by mother, not even at the termination hearing itself.[9]

Under the Court of Appeal's expansive view of the scope of an appeal of an order terminating parental rights, postjudgment evidence of circumstances involving the minor's present out-of-home custody status during the pendency of the appeal would be routinely and liberally considered. Appointed counsel for the minor in the appeal would be encouraged, and indeed obligated, to independently investigate such evidence outside the record and bring it to the reviewing court's attention for consideration in the appeal. Basic formalities such as the need for a notice of appeal, and the requirement that issues raised on appeal first be raised in the trial court, would be dispensed with, and a best interests standard of review, applied anew from the perspective of the reviewing court, would be utilized to determine whether the juvenile court's judgment should be reversed and the case remanded for a new 366.26 hearing, even where the juvenile court itself has committed no legal error in terminating parental rights on the record evidence before it.

█ Given the state's strong interest in the expeditiousness and finality of juvenile dependency proceedings (see *In re Sade C.* (1996) 13 Cal.4th 952,

---

[9] As we explained in *Cynthia D., supra,* 5 Cal.4th 242, "It is not the purpose of the section 366.26 hearing to show parental inadequacy, which had to have been previously established, and there is no burden on the petitioning agency to show at the section 366.26 hearing that the parents are 'at fault.' " (*Id.* at p. 254.) "A parent whose conduct has already and on numerous occasions been found to grievously endanger his or her child is no longer in the same position as a parent whose neglect or abuse has not so clearly been established. At this point the interests of the parent and child have diverged, and the child's interest must be given more weight. Because section 366.26 contemplates termination of parental rights only when there is clear and convincing evidence that the child is likely to be adopted, the child's fundamental interest in the opportunity to experience a stable parent-child relationship is very much at stake at the section 366.26 hearing." (*Ibid.*) "In light of the earlier judicial determinations that reunification cannot be effectuated, it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home. By the time of the section 366.26 hearing, no state interest requires further evidence of the consequences to the child of parental unfitness, let alone evidence that meets an elevated standard of proof." (*Cynthia D.,* 5 Cal.4th at p. 256.)

The one exception is when a colorable claim that the so-called benefit exception should be applied is raised at the termination hearing, because under the second prong of the benefit exception, the trial court at such hearing may inquire into whether the minor would benefit from a continuing relationship with the parent or parents whose parental rights stand to be terminated. (§ 366.26, subd. (c)(1)(A).) Although mother did raise that claim at the 366.26 hearing, and although her *sole* claim on appeal is that the trial court erred in failing to invoke the benefit exception in her case, hers could hardly be deemed a potentially meritorious claim, because she failed to meet the threshold prong required for the benefit exception to apply—that she be shown to have "maintained regular visitation and contact with the child." (*Ibid.*) Mother herself testified at the termination hearing that she had not visited her child for significant portions of the months preceding the hearing while the child remained in her father's custody. Maternal grandfather's sworn statements corroborated her concession.

993 [55 Cal.Rptr.2d 771, 920 P.2d 716] [the state has a "strong" interest in the expeditiousness of dependency proceedings, and its interest in the finality of such proceedings is "stronger still"]), the statutory scheme generally does not permit the critical findings and orders made prior to the final setting of the 366.26 hearing to be reopened and relitigated in an appeal from the order terminating parental rights.[10] Nor can the order setting the hearing itself, or any findings subsumed therein, be appealed unless earlier writ review of any substantive claim was first sought and denied. (§ 366.26, subd. (*l*).) And the Legislature has further expressly provided that the final order terminating parental rights and freeing the child for adoption itself cannot be collaterally attacked in the trial court. (§ 366.26, subd. (i).) To the extent the Court of Appeal's expansive theories and holding regarding appeals of judgments entered pursuant to section 366.26 would allow and encourage the reopening of any foundational order or finding in support of the judgment terminating parental rights, they are at odds with each of these procedural limitations which section 366.26 imposes on review of judgments terminating parental rights.

■ We therefore conclude that consideration of postjudgment evidence of changed circumstances in an appeal of an order terminating parental rights, and the liberal use of such evidence to reverse juvenile court judgments and remand cases for new hearings, would violate both the generally applicable rules of appellate procedure, and the express provisions of section 366.26 which strictly circumscribe the timing and scope of review of termination orders, for the very purpose of expediting the proceedings and promoting the finality of the juvenile court's orders and judgment.[11] To the extent anything said in *In re Jonathan M., supra,* 53 Cal.App.4th 1234, *In re Eileen A., supra,*

---

[10] As we recently observed, "After reunification efforts have failed, it is not only important to seek an appropriate permanent solution—usually adoption when possible—it is also important to *implement* that solution reasonably promptly to minimize the time during which the child is in legal limbo. A child has a compelling right to a stable, permanent placement that allows a caretaker to make a full emotional commitment to the child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, at p. 306 [19 Cal.Rptr.2d 544, 851 P.2d 826].) Courts should strive to give the child this stable, permanent placement, and this full emotional commitment, as promptly as reasonably possible consistent with protecting the parties' rights and making a reasoned decision. The delay an appellate reversal causes might be contrary to, rather than in, the child's best interests." (*In re Celine R.* (2003) 31 Cal.4th 45, 59 [1 Cal.Rptr.2d 432, 71 P.3d 787].)

[11] In light of our disposition on the facts of this case, we have no occasion to further address the question whether any particular circumstances may give rise to an exception to the general rule that postjudgment evidence is inadmissible in a juvenile dependency appeal from an order terminating parental rights. On one past occasion, however, this court did recognize one such exception. In *In re Elise K.* (1982) 33 Cal.3d 138 [187 Cal.Rptr. 483, 654 P.2d 253], all of the parties were in agreement, and offered to stipulate, that due to changed circumstances and the minor's advanced age, the minor in that case *was no longer adoptable* within the meaning of former Civil Code section 232, subdivision (a)(7), thereby undermining the foundational basis of the trial court's order terminating mother's custody and control over the minor. This court

84 Cal.App.4th 1248, *In re Jeremy S., supra,* 89 Cal.App.4th 514, or *In re Jayson T., supra,* 97 Cal.App.4th 75, is inconsistent with the views expressed herein, those decisions are disapproved.

The parties have also briefed the issue of whether the Court of Appeal was correct in concluding that section 317 requires counsel appointed for a minor in a parent's appeal of an order terminating parental rights to independently investigate the current circumstances of the child's preadoptive placement, and to report any significant changes to the reviewing court so that the court can determine anew whether the trial court's judgment should be reversed, and the matter remanded for a new 366.26 hearing. Because we have concluded the Court of Appeal erred in holding that the postjudgment evidence in question in this case was cognizable and admissible in mother's appeal in the first instance, the judgment must be reversed, and there is no need to further address this related issue. However, because the Court of Appeal erred in its conclusion that section 317 "makes no differentiation between minor's trial counsel and minor's appellate counsel," and echoed that erroneous conclusion, as well as reached seemingly conflicting conclusions, in other reported decisions, we make the following observations.

Subdivision (d) of section 317 expressly provides, in unambiguous terms, that "The counsel appointed by the court shall represent the parent, guardian, or minor at the detention hearing and at all subsequent proceedings *before the juvenile court.*" (Italics added.) Furthermore, the placement of section 317 in

---

determined that it was appropriate to accept that stipulation, and on that basis the judgment of the superior court was reversed. (33 Cal.3d at p. 139.)

 *Elise K.* therefore serves as precedent for the proposition that where postjudgment evidence stands to completely undermine the legal underpinnings of the juvenile court's judgment under review, and all parties recognize as much and express a willingness to stipulate to reversal of the juvenile court's judgment, an appellate court acts within its discretion in accepting such a stipulation and reversing the judgment. Beyond that scenario, however, the nature and scope of any exception to the general rule of nonadmissibility of postjudgment evidence in an appeal by a parent or parents from an order terminating parental rights must await a case in which the facts squarely present the issue. Here, the postjudgment evidence in question did not even directly relate to, much less undermine, the juvenile court's finding of the adoptability of the minor Zeth, as conceded by minor's appellate counsel at oral argument. Moreover, as regards the asserted new evidence of changed circumstances in this case—that maternal grandfather felt pressure to adopt the minor and would have preferred to become the minor's legal guardian—that "evidence" only came to the attention of the Court of Appeal through an unsworn statement in a letter brief submitted by minor's appointed appellate counsel. It is axiomatic that the unsworn statements of counsel are not evidence. (See, e.g., *In re Heather H.* (1988) 200 Cal.App.3d 91, 95 [246 Cal.Rptr. 38] ["unsworn testimony does not constitute 'evidence' within the meaning of the Evidence Code"]; *People v. Lee* (1985) 164 Cal.App.3d 830, 841 [210 Cal.Rptr. 799] [same]; *People v. Superior Court (Crook)* (1978) 83 Cal.App.3d 335, 341 [147 Cal.Rptr. 856] [statements by counsel are not evidence]; see also Rules Prof. Conduct, rule 5-200(e) [attorneys must not "assert personal knowledge of the facts at issue, except when testifying as a witness"].)

that portion of the Welfare and Institutions Code governing juvenile dependency proceedings in the trial court is further evidence that its provisions were intended to govern trial counsel's representation of minors in juvenile court, not appellate counsel's representation of minors in the appellate courts. (See, e.g., *People v. Seneca Ins. Co.* (2003) 29 Cal.4th 954, 959–959 [129 Cal.Rptr.2d 842, 62 P.3d 81] [statute governing release of convicted defendants on bail pending sentencing inapplicable to convictions by guilty plea in light of placement in Penal Code and "context" of surrounding provisions].) Section 317 is found in chapter 2 (*Juvenile Court* Law, italics added) of part 1 (Delinquents and Wards of the *Juvenile Court,* italics added) of division 2 (Children) of the Welfare and Institutions Code.

The provisions of section 317 are addressed to the duties and obligations of counsel *appointed by the juvenile court* to represent minors *in the juvenile court.* Every reference to the "court" in section 317 is plainly intended as a reference to the juvenile court. For example, the court is empowered to "fix the compensation *to be paid by the county* for the services of appointed counsel" (§ 317, subd. (c), italics added), a provision that would be inapplicable to counsel appointed in the Court of Appeal, who are not paid from county coffers. There is simply nothing in the language of section 317 that would affirmatively support the Court of Appeal's conclusion that the Legislature intended its provisions to apply to counsel appointed for minors in dependency appeals. (Accord, *In re Steven H.* (2001) 86 Cal.App.4th 1023, 1029–1030 [103 Cal.Rptr.2d 649] [section 317, subdivision (d) requires counsel appointed for a minor to continue representing the minor *at all subsequent proceedings before the juvenile court,* but not in proceedings before the appellate court].) The superior court, sitting as a juvenile court in the county in which a dependency appeal arises, is neither responsible for nor obligated to appoint counsel for a minor in the Court of Appeal of the appellate district in which the appeal will be heard. The Court of Appeal, in its administrative function, makes the determination whether to appoint counsel for a minor on appeal, not the juvenile court from which the appeal arises.

■ The Court of Appeal therefore erred in its construction of section 317. Although a reviewing court is free to appoint separate counsel for a minor in an appeal of an order and judgment terminating parental rights, section 317 does not compel the appellate court to make such an appointment of counsel, nor does that section purport to prescribe or regulate the duties and obligations of appointed counsel in juvenile dependency appeals.

## CONCLUSION

The judgment of the Court of Appeal is reversed and the matter remanded to that court for further proceedings consistent with the views expressed herein.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.